Michael T. Ashley, Esq.
ASHLEY LAW, A Limited Liability Company
50 Park Place, Suite 1400
Newark, New Jersey 07102
P.973.623.0501 F.973.623.0329
E. ashleylaw@ashley-law.com
Bar No. 270032021
*Attorneys for Plaintiff Patrick Thomas*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK THOMAS,<br><br>             Plaintiff,<br><br>                   v.<br><br>TOWNSHIP OF BLOOMFIELD;<br>BLOOMFIELD FIRE DEPARTMENT;<br>WALTER COFFEY; CHIEF LOU<br>VENEZIA; JOHN DOES 1-10,<br><br>             Defendants. | **COMPLAINT AND DEMAND FOR TRIAL BY JURY**<br><br><br>Civil Action No.: |

Plaintiff PATRICK THOMAS ("Plaintiff"), residing at 41 Prospect Street, Township of Bloomfield, County of Essex, State of New Jersey ("Plaintiff") by and through retained counsel Michael T. Ashley, Esq. hereby alleges and complains:

## PRELIMINARY STATEMENT

1.      This is an action brought to seek redress for defendants' unlawful discrimination of Plaintiff in violation of his rights under the Equal Protection Clause of the Fourteenth Amendment to the United State Constitution, the Civil Rights Act of 1871, as amended, codified

as 42 U.S.C. §1983, <u>N.J.S.A.</u> 10:6-2 the New Jersey Civil Rights Act ("C.R.A."), <u>N.J.S.A.</u> 10:5-1 *et seq.* the New Jersey Law Against Discrimination ("L.A.D."), and pendent state law claims.

2.      Plaintiff's rights to be free from racial discrimination and a hostile work environment, *inter alia*, were violated when defendant Walter Coffee was allowed to taunt him with a noose during the commission of thier official duties and in the presence of supervisory officials on multiple occasions without the imposition of the appropriate consequences.

3.      Plaintiff seeks an award of compensatory damages, punitive damages, and attorneys' fees and costs as set forth in more detail below.

## JURISDICTION AND VENUE

4.      The United States District Court for the District of New Jersey has original jurisdiction of this action under 28 U.S.C. § 1331 and 1343(a)(3), insofar as certain causes of action pleaded herein arise under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

5.      In addition, the United States District Court for the District of New Jersey has supplemental jurisdiction over the pendent state law claims pleaded herein, pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because the events/omissions giving rise to these causes of action all occurred in the District of New Jersey and, upon information and belief, all of the defendants reside or are domiciled in this district.

## PARTIES

7.      Plaintiff was at all material times a resident of the Township of Bloomfield, Essex County, New Jersey, duly employed by defendant TOWNSHIP OF BLOOMFIELD (hereinafter "Bloomfield").

8.      Bloomfield is a municipal corporation and the public employer of defendant CHIEF LOU VENEZIA ("Chief Venezia") and WALTER COFFEY ("Coffey" and together with Chief Venezia "Individual Defendants").

9.      Individual Defendants at all times in the relevant period, were duly appointed officials of the BLOOMFIELD FIRE DEPARTMENT ("BFD" herein) acting under color of law. Individual Defendants are being sued individually and in their official capacities.

10.     Coffey is and at all relevant times was a natural person residing at 15 Vetrone Drive, Woodland Park, in the District of New Jersey.

11.     Chief Venezia was at all times relevant to this complaint the chief of the BFD and delegated authority from Bloomfield to be the de facto policymaker thereof.

12.     The BFD is and was, at all times in the relevant time period, a division and/or department of Bloomfield entrusted with, among other things, fighting fires and otherwise ensuring the safety of people and property within the jurisdictional limits of Bloomfield.

13.     Defendants JOHN DOES 1–10, are presently unknown officials, employees, agents, acting supervisors, and/or representatives of Bloomfield, and/or BFD, and/or other yet unknown public entity, making no representation as to gender or rank, whose unlawful actions are described, referenced, and/or set forth herein.

14.     The true names and identities of defendants John Does 1–10 are not currently known to Plaintiff. However, they may be employees or agents of the BFD or Bloomfield.

15.     Bloomfield, BFD, Chief Venezia, Coffey, and John Does 1-10 are collectively referred to herein as, "Defendants."

16.      The Individual Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice, and deliberate indifference to Plaintiff' rights.

3

17.     At all relevant times, the Individual Defendants acted in concert to assist each other in performing the various actions described herein and lending their physical presence, support, and the authority of their offices to one another.

## STATEMENT OF FACTS

18.     Coffey has been employed by Bloomfield through the BFD as a firefighter since about the year 2000.

19.     During his tenure with the BFD, upon information and belief, Coffey has on numerous occasions used the derogatory term "nigger" in the presence of African American members of the BFD to harass, intimidate, and as a means of informing minorities of their status as inferior within the institution.

20.     Despite his objectively offensive use of racial epithets, Coffey was never subject to discipline or any consequence by Bloomfield or BFD demonstrating their pattern, custom, and policy of allowing unlawful discrimination in the workplace.

21.     On or about November 8, 2023, during a departmental training focused on rope and knot techniques used in firefighting, Coffey spontaneously approached Plaintiff and stated, "Thomas, there is a noose upstairs on the table, did you see it?"

22.     Plaintiff replied by asking, "Why would I want to see a noose?" and inquired if Coffey knew who was responsible for putting it on display. Coffey smirked and replied that he did not know.

23.     Coffey's use of Plaintiff's name reflects a level of familiarity from their working relationship and intention to specifically target him based on his racial identity as an African American.

24.     Said discriminatory act took place in the presence of numerous members of the BFD, including those with supervisory authority over Plaintiff in addition to an independent instructor.

25.     Nonetheless, there was no investigation, questioning, sanction, or other repercussion against Coffey for his actions in accord with custom of Bloomfield and the BFD to allow racial bias in the workplace.

26.     Such inaction on the part of the BFD and Bloomfield, in light of the fact that they knew or should have known about Coffey's discriminatory behavior, is tantamount to a tacit endorsement of his actions.

27.     On November 16, 2023, a subsequent knot training session was held where Plaintiff, Coffey, supervisory officials, and several other firefighters were present.

28.     The session was conducted inside of a firehouse owned and operated by Bloomfield which was equipped with CCTV cameras.

29.     As the training was concluding, Coffey tied a hangman's noose and threw it toward Plaintiff while laughing, stating, "I want you to figure out what kind of knot this is."

30.     Plaintiff replied that, "I know exactly what this is, this is a noose. This is what people used to hang my ancestors from trees. You think this is funny?" Coffey's only response was to continue laughing.

31.     This occurred in the presence of other firefighters, including those serving in a supervisory role, and the independent course instructor.

32.     Plaintiff's initial shock from the boldness of Coffey's actions were followed by rage, distress, and humiliation at the public display of racism while trying to exercise the official duties of his employment.

33.    Plaintiff asserts that Coffey's conduct was intended to degrade and humiliate him because of his race, resulting in severe emotional and psychological harm.

34.    The incident was briefly investigated by Bloomfield who, upon information and belief, obtained several corroborating witness statements before the Essex County Prosecutor's Office ("ECPO") adopted the case.

35.    On December 14, 2023, Coffey was charged by summons complaint with Bias Intimidation an indictable offense, in violation of N.J.S.A. 2C:16-1A(1) punishable by a state prison sentence (the "Coffey Complaint").

36.    The criminal complaint alleged that, "ON OR ABOUT THE 16TH DAY OF NOVEMBER, 2023, IN THE TOWNSHIP OF BLOOMFIELD, THE DEFENDANT DID COMMIT, ATTEMPT TO COMMIT, CONSPIRE WITH ANOTHER TO COMMIT, OR THREATEN THE IMMEDIATE COMMISSION OF AN OFFENSE SPECIFIED IN N.J.S. 2C:33-4, TO WIT: HARASSMENT, WITH A PURPOSE TO INTIMIDATE AN INDIVIDUAL OR GROUP OF INDIVIDUALS BECAUSE OF RACE…OR ETHNICITY, BY TYING A ROPE INTO A NOOSE, THROWING IT AT THE VICTIM, PATRICK THOMAS, AN AFRICAN AMERICAN MALE, AND ASKING HIM TO FIGURE OUT WHAT KIND OF KNOT THAT WAS, A FOURTH-DEGREE CRIME IN VIOLATION OF N.J.S.A. 2C:16-1A(1).[1]"

37.    It further set forth therein that the November 16, 2023 incident was captured on CCTV video and attested to by numerous eyewitnesses.  The witness statements and CCTV footage were provided by Bloomfield to the ECPO and, upon information and belief, each entity retains them in their custody.

---

[1] Criminal Complaint S-2023-671-0702.

38.     On or about April 1, 2024, Coffey was indicted by an Essex County Grand Jury for the same charge contained in the Coffey Complaint.

39.     After initially being rejected, on December 4, 2024, Coffey was admitted to the Pre-Trial Intervention program in connection with the criminal charges against him.

40.     Thereafter, Bloomfield continued its investigation into Coffey's discriminatory acts against plaintiff which had been suspended at the time the criminal case was adopted by the ECPO.

41.     Bloomfield's investigation into Coffey's discriminatory acts continued into May 2025 when their agents requested that Plaintiff appear for an interview.

42.     On May 7, 2025 Plaintiff responded to the office of the law firm conducting the investigation into Coffey on behalf of Bloomfield.

43.     When the meeting started, counsel representing Bloomfield represented that they had summoned Plaintiff to assist in trying to, "figure out what happened." In response, it was set forth that the best evidence of what happened was the CCTV video on which Coffey is observed presenting the noose.

44.     Perplexingly, despite that the CCTV footage was referenced in widely publicized media accounts of the incident and the criminal complaint, somehow counsel for Bloomfield was unaware that a video of the incident existed.

45.     Notwithstanding, Plaintiff cooperated with the interview and disclosed fully the facts surrounding the discrimination perpetrated upon him as well as his knowledge of other racist incidents involving Coffey.

46.     Six months after Plaintiffs interview and nearly two years after Coffey was charged with a hate crime, there has been no notice that Bloomfield's investigation into this

7

incident has concluded and upon information and belief Coffey remains employed with Bloomfield through the BFD.

47.    In the immediate aftermath of the November 16, 2023 noose incident, Plaintiff was told by Chief Venezia that, "We cannot keep paying you," if he did not return to work and his sick days would be used to compensate for his time away from the job used to deal with the effects of Coffey's racist assault.

48.    Plaintiff elected to seek independent clinical evaluation for his mental and emotional distress in connection with the racial discrimination of Coffey by December 2023.

49.    In February 2024 Plaintiff completed an application for workers compensation and requested that Bloomfield relied on the opinion of his independent clinical in rendering a decision.

50.    His request was denied and he agreed to meet with Bloomfield's chosen practitioner, Dr. Janet Sotomayor, to evaluate his worker's compensation claim on or about March 4, 2024 which was ultimately denied. However, Defendants failed to produce any documentation substantiating said denial despite the fact it was requested by Plaintiff.

51.    As a result, Plaintiff's sick time was utilized to account for his time out of work from November 2023 through May 2024.

52.    In May 2024 Plaintiff was advised by Chief Venezia that he was running out of sick time and would need to solicit donations from other firefighters to maintain his pay.

53.    Plaintiff knew from his work with his own independent clinician that he was suffering from significant injuries in connection with the crimes perpetrated against him by Coffey and that his return to his job was not appropriate at that time.

54.     Chief Venezia's attempt to make Plaintiff beg and borrow to be renumerated for his time out of work due to his victimization was part of Bloomfield's tacit policy of treating African Americans worse than their colleagues from other racial backgrounds.

55.     On May 13, 2024 correspondence from Bloomfield indicated their intent to place Plaintiff on unpaid leave resulting in him losing all income due and still being responsible for over $1000.00 in medical premiums each month.

56.     Bloomfield's proposed course was offensive given their lack of support during the incident and the legitimate injuries which had been suffered.

57.     After Plaintiff objected to this process, counsel for Bloomfield advised via email on June 20, 2024 that as soon as they received the medical report from his clinician and his request for extended leave, it would be reviewed and offered to the town council for approval.

58.     In the absence of any documentation which would justify Bloomfield's denial of his worker's compensation claim and faced with a potential unpaid leave, Plaintiff had his treating clinician prepare a written report which included specific diagnoses and a recommendation that he abstain from working for the time being about a week later.

59.     After Plaintiffs clinical report was delivered, there was no communication for over a month and it is not apparent if extended leave was ever presented to the town council as had been promised.

60.     Eventually, Plaintiff visited with a second clinician chosen by Bloomfield who opined that it was his opinion, within a reasonable degree of psychological probability that his diagnoses were developed as a result of his victimization by a Coffey while working in his capacity as a firefighter.

61.    Subsequent to this medical opinion, Bloomfield sought to have Plaintiff visit a third clinician for yet another evaluation seemingly in an attempt to get him back to work prematurely.

62.    Plaintiff replied, through counsel on November 13, 2024, that under any set of circumstances, he should be made to involuntarily labor against the advice of multiple medical professionals.

63.    On or about September 10th and 11th of this year, Plaintiff visited with a clinician from the Institute for Forensic Psychology ("IFP") at Bloomfield's request.

64.    Correspondence dated November 11, 2025 informed Plaintiff that according to the IFP he, "suffers a degree of mental illness or disability in his job-related conduct that is of sufficient magnitude so that the undersigned finds the subject impaired and unlikely to be restored to duty in a reasonable period of time."

65.    It is apparent at this time, that Bloomfield's chosen clinicians are of the opinion that Coffey's discriminatory act towards Plaintiff on the job have resulted in significant emotional distress and long term, if not permanent, psychological injury.

**SUPPLEMENTAL FACTS CONCERNING MUNICPIAL LIABILITY**

66.    At the time of the victimization of Plaintiff, only four of approximately eighty Bloomfield firefighters were African American despite representing approximately 20% of the township's population.

67.    Plaintiff reports that no municipal officials, including three successive mayors, council members, or congressional representatives, reached out following the incident.

68.    He also observed that officials avoided contact when he encountered them in person, a reaction he found particularly painful given his commitment to safeguarding the community.

69.     BFD is the entity legally responsible for the hiring, retention, supervision, discipline, and training of employees of the BFD, including each of the Individual Defendants.

70.     BFD is an administrative subdivision of Bloomfield. Bloomfield, acting through its mayor and Town Council, is the definitive policymaking authority for all officially adopted policies and procedures implemented by employees of BFD, including the Individual Defendants.

71.     Management level employees of Bloomfield knew, or should have known, of Coffey's abusive conduct and failed to take prompt and adequate remedial action as he remains employed by the municipality and termination was appropriate.

72.     Management level employees should have known of the abusive conduct because an employee provided management level personnel with enough information to raise a probability of racial harassment in the mind of a reasonable employer and the harassment was so pervasive and open that a reasonable employer would have had to be aware of it.

73.     Plaintiff's equal protection rights were violated because Chief Venezia failed to properly to address Coffey's harassment and he acted with intent to discriminate as evidenced by the assertions hereinabove.

74.     Chief Venezia's failure to investigate the source of Coffey's brazenly racist behavior implicitly encouraged the continuation of a hostile work environment and further abuse of the African American members of the BFD.

75.     The racist actions of Coffey were improperly addressed by Chief Venezia and others with formal or de facto supervisory authority under circumstances that show that the supervisory individuals had an intent to discriminate.

76.

11

77.    The aforementioned failures of Bloomfield have established customs, policies, practices, procedures, and rules of Bloomfield and the BFD.

78.    Bloomfield is on notice that there is a wide-spread and systemic pattern, custom, and practice within the to perpetrate constitutional violations upon members of the public and its employees based on racial animus.

79.    Bloomfield has been noticed of the unconstitutional conduct of its employees through previous notices of intents to sue, lawsuits, internal affairs investigations, criminal convictions, and media reports as referenced herein and otherwise.

80.    There is a pattern and custom of Bloomfield condoning illegal and unconstitutional practices. For example:

    i.    A recent award of $1 million based on allegations that Bloomfield discriminated against military veterans.[2]

    ii.    Allegations that Bloomfield unlawfully withheld benefits from a 35-year employee with cognitive limitations resulted in a $150,000.00 settlement.[3]

    iii.    Denying a public records request seeking the email addresses of residents to keep them abreast of civil rights issues, hate crimes, racial justice issues and gender pay disparities in municipal pay in Bloomfield.[4]

---

[2] **Bloomfield cops who claimed discrimination because of military service awarded $1 million**, NorthJersey.com (July 25, 2019) https://www.northjersey.com/story/news/essex/bloomfield/2019/07/25/bloomfield-nj-cops-who-were-discriminated-against-awarded-1-million/1801422001/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z114001d00----v114001b0045xxd004565&gca-ft=27&gca-ds=sophi
[3] **He spent 35 years as a school janitor, barely earning minimum wage. He just won a $150K settlement**, NJ Advance Media (January 31, 2025) https://www.nj.com/education/2025/01/he-spent-35-years-as-a-school-janitor-barely-earning-minimum-wage-he-just-won-a-150k-settlement.html
[4] **A racial justice organization has sued 30 towns in NJ. Here's what they're looking for**, NorthJersey.com (May 11, 2022) https://www.northjersey.com/story/news/new-jersey/2022/05/11/rise-against-hate-emails-raise-awareness-nj-civil-rights-racial-justice/9634620002/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z114001d00----v114001b0045xxd004565&gca-ft=37&gca-ds=sophi

iv.  <u>Crespo v. Township of Bloomfield</u>, et. al, No. 2:14-cv-07279

(November 21, 2014): Members of the BPD pitilessly beat a

man in their custody, without provocation, resulting in severe

injuries including a thoracic spine fracture.

v.  <u>Jeter v. Township of Bloomfield</u>, et. al, No. 2:14-cv-05387

(August 27, 2014): Falsely arrested Black man was accused of

grabbing officers gun and brutishly beaten before being

completely exonerated, both officers involved were later

convicted for official misconduct related to the filing of false

reports to justify their use of excessive force.[5]

vi.  Seton Hall Law School's Center for Policy & Research's

Racial Profiling Report: Bloomfield Police and Bloomfield

Municipal Court (April 11, 2016): Finding that BPD policing

patterns were racially disproportionate and concluding that

African Americans and Latinos are, collectively, BPD's target

group.[6]

vii.  Seven out of eight BPD officers with the most uses of force

between 2012 and 2016 did so upon a Black person more than

45% of the time in a township where Blacks only account for

approximately 16% of the population.[7]

---

[5] *See* **State v. Trinidad**, 241 N.J. 425 (2020) (Supreme Court upheld the conviction of BPD Officer convicted for official misconduct, making false statements, falsifying records, and other offenses based on, "overwhelming evidence.").
[6] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2760382.
[7] **NJ.com Force Report, Bloomfield** at http://force.nj.com/database/pd-dept/bloomfield-essex

    viii.   Based on population, a Black person in Bloomfield is 252% more likely to have force used upon them than a non-ethnic person.[8]

    ix.   Based on arrest, a Black person in Bloomfield is 83% more likely to be subjected to a use of force than a non-ethnic person.[9]

81.    Although Bloomfield has publicly pronounced themselves to be rehabilitated, racially biased violations of civil rights persists.

82.    Bloomfield has, "not taken any overt action to address public requests for anti-racist reform, including addressing the issues associated with policing on Bloomfield Ave or adopting a warning before shooting policy," according to a 2020 report.[10]

## HISTORICAL CONTEXT OF THE NOOSE

83.    Plaintiff is an African American man whose maternal and paternal ancestors endured the horrific tragedy of the Trans-Atlantic Slave Trade and the subsequent oppressive era of Jim Crow.

84.    During these times, lynchings of Black people were not only acts of brutal violence but were also disturbingly celebrated by many White communities as public spectacles and sources of entertainment.

85.    These brutal acts, often involving hanging with a noose, were deeply embedded in American societal structures and cultural practices.

---

[8] Id.
[9] Id.
[10] **Bloomfield police stop Black and Latino drivers at disproportionate rates, new analysis shows**, Bloomfield Information Project (September 20, 2020) at https://bloomfieldinfo.org/2020/09/30/bloomfield-police-stop-black-and-latino-drivers-at-disproportionate-rates-new-analysis-shows/

86.     Photographic evidence from the 1940s through the 1960s shows Black men and women lynched—sometimes mutilated—with smiling White onlookers, including men, women, and children, illustrating the widespread normalization of racial terror.

87.     This legacy of racial violence is echoed in poignant cultural expressions like Billie Holiday's song "Strange Fruit," which captures the haunting significance of these lynchings.

88.     The impact of these historical injustices permeates American life and law, influencing landmark cases such as the Dred Scott decision, the murder of Emmett Till, and the recent George Floyd case.

89.     For African Americans, the noose continues to evoke a reasonable and profound trauma rooted in this long history of racial terror and systemic injustice.

90.     Coffey's act alone was purported to impart to plaintiff the painful memory of an era during which thousands of black men were lynched by racist white mobs, including the Ku Klux Klan.

<u>**COUNT ONE**</u>
**Hostile Work Environment**
**42 U.S.C. § 1983**
**(Against All Defendants)**

91.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     Plaintiff was denied by Bloomfield of his right to not be subjected to a hostile work environment and enjoyment of the rights and privileges and equal protection of the law due to him under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

93.     Plaintiff was subjected to harassment motivated by racial bias by Coffey.

15

94.    The harassment perpetrated by Defendants was not welcomed by Plaintiff.

95.    The racist actions, constituting criminal harassment by Coffey were motivated by Plaintiff's status as an African American.

96.    Defendants conduct was so severe and pervasive that a reasonable person in Plaintiff's position would find his work environment to be hostile or abusive.

97.    Plaintiff believed his work environment to be hostile or abusive as a result of Coffey's conduct.

98.    As described hereinabove, Defendants with discriminatory intent have, failed to meaningfully address the unconstitutional acts perpetrated against Plaintiff.

99.    Defendants thus created a tacit policy, practice, and custom of permitting actions like those of Coffey to continue with impunity.

100.    Bloomfield acted under color of law pursuant to an implicit policy or custom and practice whereby acts of racist harassment are permitted, tolerated, and condoned.

101.    The injuries suffered by Plaintiff are the highly predictable consequence of the customs and practices of Bloomfield as opportunities for like violations are likely recur.

102.     Defendants intentionally, knowingly, recklessly, with willful and wanton disregard failed to properly investigate and take appropriate action in relation to racist harassment, amounting to deliberate indifference.

103.    This caused a culture where, as here, individuals, such as Coffey, acted without fear of meaningful reprimand.

104.    The lack of appropriate discipline has created an unsafe culture that incites individuals to violate the rights of African Americans as they know that they will not be properly held accountable.

105.    Bloomfield, therefore, directly or indirectly, and under color of law, thereby approved or ratified the unlawful, malicious, and wanton conduct of Coffey.

106.    The ratification of such behavior by Defendants was the moving force behind the constitutional violations upon Plaintiff and representative of a course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.

107.    As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff was humiliated, disgraced, suffered damage to his reputation, permanent mental and emotional injury, monetary loss, and other damages.

**COUNT TWO**
**Racial Discrimination**
**42 U.S.C. § 1983**
**(Against All Defendants)**

108.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

109.    Plaintiff is an African American, a racial minority.

110.    Plaintiff was qualified for his position as a firefighter with the BFD.

111.    Plaintiff was constructively discharged by notice that he was not fit for duty and would not be so situated for the foreseeable future.

112.    Other non-racial minorities were not discharged as Plaintiff was or otherwise made to grovel for the rights due to them.

113.    As a direct and proximate result of Defendants' acts and/or omissions, Plaintiff sustained the damages hereinabove alleged.

**COUNT THREE**
**Hostile Work Environment**
**N.J. Law Against Discrimination**

17

**(Against All Defendants)**

114.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115.    The unlawful and criminal harassment of Plaintiff would not have occurred but for his status as a member of a constitutionally protected class, African Americans.

116.    The harassment of Plaintiff was of such severity and pervasiveness that a reasonable member of his protected class would believe that the conditions of employment were altered and the working environment became hostile and abusive.

117.    Defendants' acts and/or omissions deprived the Plaintiff of his entitlement to rights, privileges or immunities secured by the New Jersey Constitution.

118.    Said defendants' acts and/or omissions were taken under color of law.

119.    As a direct and proximate result of said defendants' acts and/or omissions, Plaintiff sustained the damages hereinabove alleged.

<u>**COUNT FOUR**</u>
**Racial Discrimination**
**N.J. Civil Rights Act**
**(Against All Defendants)**

120.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

121.    Defendants, acting under color of law and within the scope of their employment, deprived Plaintiff of his clearly established rights, privileges and immunities guaranteed him by the Constitutions of the United States and the State of New Jersey, including without limitation his rights to equal protection and due process, in violation of N.J.S.A. 10:6-2.

122.    Defendants, in their official capacity, deprived Plaintiff of his Constitutional rights in his employment by denying his right to be free of harassment based on his racial status as an African- American.

123.    Defendants' wrongful actions and inactions were products of official unconstitutional policies adopted and/or unconstitutional customs and usages tolerated by Defendants.

124.    Defendants' wrongful actions and inactions directly and proximately caused Plaintiff to suffer the foregoing civil rights violations.

**COUNT FIVE**
**Common Law Negligent and Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

125.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

126.    Defendants acted intentionally or recklessly with deliberate disregard of a high degree of probability that emotional distress will follow. Defendants' conduct was extreme and so outrageous in character and degree as to go beyond all possible bounds of decency. Defendants' conduct was so atrocious, it is utterly intolerable in a civilized nation of laws.

127.    As a direct and proximate result of Defendants' acts and/or omissions, Plaintiff sustained the damages hereinabove alleged.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants individually and jointly and pray for relief as follows:

a.    That he be compensated in the amount of $25,000,000.00 for violation of his constitutional rights as set forth hereinabove, loss of liberty, emotional distress, humiliation, loss of property, costs and expenses, and other damages and injuries;

b. That he be awarded punitive damages against all defendants;

c. That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d. For such other further and different relief as to the Court may find is just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

**ASHLEY LAW**
Attorneys for Plaintiff

_____
Michael T. Ashley, Esquire

Dated: Newark, New Jersey
       November 16, 2025

## CERTIFICATION

I certify that the matter in controversy is not the subject of any other action pending or contemplated. I further certify that I am aware of no other parties who should be joined in this matter whose identities are known to the plaintiff.

Respectfully submitted,

Michael T. Ashley, Esquire

Dated: Newark, New Jersey
November 16, 2025

21